Cyrus A. Royston and Wife, plaintiffs in error, vs. Mildred A. F. Royston, administratrix, defendant in error.

[1.] It is not too late, under our equity system, to purge an answer of impertinence or scandal, after replication filed.

[2.] It is no error to allow counsel, while addressing the jury, to use and refer to a written argument.

[3.] In charging rent against a guardian, for lands occupied by him, it is right to allow him credit for the value of improvements put on it by him; but then he must be charged with the rent as increased by this superadded value to the land.

[4.] It is proper, in estimating the value of rent, to receive evidence of the rent brought by neighboring lands of like quality, during the same time, and also evidence that, during that time, many neighboring lands lay idle, and that it was common there for renting plantations to be rented once in every four or five years for no price but repairs.

[5.] There is no law authorizing the administrator of a deceased guardian to make returns to the Court of Ordinary, of moneys paid out for the ward, either by the guardian in his lifetime, or by the administrator afterwards, and such returns, when made, are not evidence for the benefit of the guardian.

[6.] It is error to receive the sayings of a guardian in his own favor, offered by himself or his administrator.

[7.] Where a guardian puts out the money of his ward at interest, and has to resort to suits to collect it back, it is right to allow him reasonable attorneys' fees for the collection.

[8.] The only Act (1792) which provides for a forfeiture of commissions, on account of a failure to make returns, does not embrace *guardians*, and these, therefore, are entitled to the commissions prescribed by the Act of 1764, without regard to their making or failing to make returns.

[9.] The rule of interest against guardians, &c., is as follows. Up to the 1st January, 1848, simple interest is the rule, and compound interest the exception—simple interest except in cases where there is fraud or gross negligence,

Royston et ux. vs. Royston, adm'x.

and then compound interest, the compounding to be done at the end of each period of six years. And the *rate* of interest, whether simple or compound, is 8 per cent. per annum up to the 1st January, 1846, and after that, 7 per cent. per annum up to the 1st January, 1848. After 1st January, 1848, the Legislature has prescribed a rule of its own—7 per cent. per annum for the first six years, without compounding, and 6 per cent. per annum compounded annually.

[10.] The failure of a guardian to make returns of the interest accumulated in his hands, is not by itself sufficient to authorize the finding of fraud, and the charging of compound interest.

[11.] The disbursements of a guardian ought to be made out of interest, and not of principal.

[12.] The guardian is entitled each year to retain in his hands, from the beginning of the year, without interest, enough of the funds to cover the disbursements of that year.

[13.] The commission on interest to which a guardian is entitled, is 2½ per cent. as the lowest limit, and 10 per cent. as the highest—the latter to be reached or not, according to the opinion the jury may form of the skill and fidelity with which he has managed the estate—the former the rule where interest accumulates in the hands of the guardian without *lending out*. But upon all interest *received* (from lending out) and paid away, he is entitled to at least 5 per cent.—2½ for receiving and 2½ more for paying away.

In Equity. Tried in Dougherty Superior Court, before Judge ALLEN, November Term, 1857.

This was a bill filed by Cyrus A. Royston, and wife, formerly Mary Frances Calaway, against Mildred A. F. Royston, administratrix with the will annexed of Geo. D. Royston, deceased, former guardian of said Mary Frances, for an account and settlement of her estate, which came into the hands and possession of said guardian.

The bill states, that said Mary Frances was the daughter of Felix G. Calaway, deceased, and entitled to a distributive share of her father's estate. That being a minor, Geo. D. Royston was appointed her guardian in the year 1837, and received a large estate belonging to her, consisting of money, notes, negroes and land, which he held and controlled until his death, without fully accounting for the same.

The bill contains various distinct and specific charges, which will fully appear in the proceedings had on the trial.

Defendant filed her answer, and the parties went to trial.

Royston et ux. vs. Royston, adm'x.

All the facts necessary to a full and clear understanding of the points and questions adjudicated, are embodied in the bill of exceptions and the opinion of this Court following :

GEORGIA, DOUGHERTY COUNTY.

Be it remembered, That on the tenth day of December, at the November Term of the Superior Court of said county, 1857, the case of Cyrus A. Royston, and his wife, Mary Frances Royston, (late Mary Frances Calaway,) against Mildred A. F. Royston, administratrix with the will annexed of George D. Royston, deceased, it being a case in equity for an account of the actings and doings of the said George D. Royston, as guardian of the said Mary Frances Royston, from September, 1838, till his death in March, 1852, and relief; and the same being announced ready for trial by the parties, the solicitors for complainant moved to strike from the answer for impertinence, the charge that Edward Swaine, who had intermarried with ———— Calaway, the other child of Felix G. Calaway, the sister of the said Mary F., had settled with the administratrix on the terms proposed by her to the said Cyrus A. Royston and his wife, and had allowed her in the settlement one-half the note on Thomas Chaffin, which was a matter of litigation with the parties, and the said Court, the Hon. ALEXANDER A. ALLEN, Judge, denied the motion, and the complainants excepted. And the said complainants, by their counsel, also moved the Court to strike from the answer the calculation made by defendant's counsel on the return, and exhibited as part of their answer referred to as being impertinent, and as not being really a part of the answer, to which counsel for respondent objected, and the Court sustained the objection and refused to strike the calculation from the answer, and the counsel for complainants excepted, and now assigns said decisions and ruling as errors. And the cause being submitted to the jury, the return of the said Geo D. Royston, made to the Court of Ordinary of Taliaferro county, was submitted as certified by J. Oneal, Clerk of the Court of Ordinary, the same being an exhibit to complainant's bill

—and then read in evidence the depositions of *Gilbert Kent*, taken by commission, who swore, that he borrowed five hundred dollars of Geo. D. Royston, to the best of his recollection, in 1839 or 1840 ; that it was six years before he paid it all, reducing it gradually every year. He paid 12½ per cent. interest upon the money all the while except the last year ; that year he paid 8 per cent. Don't recollect now what the whole he paid Royston amounted to. The note he gave Royston was payable to Geo. D. Royston, guardian of the orphans of Felix Calaway. Royston told witness that the money belonged to the orphans of Felix Calaway, deceased.

The counsel then read in evidence the depositions of *William Peake*, who swore, that he had never known the land of F. G. Calaway before his death ; first saw it in September, 1838, and became well acquainted with most of the cleared land in 1839, having cultivated a part of the plantation during that year as a renter, and he also cultivated a part of it the ensuing year—renting the second year from Dr. Royston, who, to the best of his knowledge and belief, controlled and occupied the plantation until his death. Does not distinctly recollect whether his agent rented the part he cultivated in 1839 from Dr. Royston or from the administrator of Dr. Calaway. He supposed there were between three and four hundred acres of cleared land at that time—perhaps more—the most of which he considered first quality. He was willing to rent the plantation for a term of ten years, and said he was willing to give an annual rent of one thousand dollars for ten years to come. He considered the plantation worth this sum, or, one thousand dollars annually during the last five or six years now past. These depositions taken 25th May, 1855. He has not particularly known the plantation or examined it ; does not know, of his own knowledge, what was Dr. Royston's manner of renting out the land ; whether he advertised or notified the people of the time and place of renting or not ; was never present at any public renting of the and ; in 1840 he rented a field of forty or fifty acres privately

from Dr. Royston, at four dollars per acre. His opinion of the annual value of plantation, as a rent, may be known from the offer he hereinbefore mentioned. Does not recollect what reason Dr. Royston may have assigned why he did not improve or clear the land. That Chaffin gave his note to Dr. Royston, as guardian, for eight or nine hundred dollars for borrowed money; witness was security on the note, and some time in the fall of 1840 gave notice to Dr. Royston to bring suit on said note, because he believed that Chaffin would soon fail, and he was unwilling to stand any longer for him. In a few days or weeks Dr. Royston gave up the note on which he was security, and took in lieu thereof, Chaffin's individual note without security. The Dr. remarked that "he was not afraid to trust Chaffin," or words to that effect. That about the year 1841 he was at Dr. Royston's home in Baker county, and being about to pass by Mr. Pope's house, the Dr. requested him to inform Mr. Pope that he wanted the latter to pay off a note or a part thereof. The Dr. remarked to him that Pope was giving $12\frac{1}{2}$ per cent. on the money; was not requested to collect the money, but only to notify Pope that the money was needed by Royston. Does not remember Pope's saying anything about the rate of interest, and in answer to the cross interrogatories, swore that he was well acquainted with most of the cleared lands in 1840, and since that time has not particularly examined the cleared lands. Has often passed the houses in which Dr. Calaway lived; was acquainted and is acquainted with the houses put on the premises by Dr. Royston, which are located between a quarter and half mile from the old Calaway houses. In my judgment the buildings of every description erected by Royston are worth about five hundred dollars more than those left on the premises by Dr. Calaway. Is not acquainted with the clearings of land or the fences made by Dr. Royston. Dr. Calaway died in 1836, he thinks. At the time he signed the note as security to Chaffin, he considered him solvent, but some time before Christmas, 1841, he did not consider him

solvent, and was unwilling, for this reason, to stand any longer for him, and so notified Dr. Royston, who gave up the note and took Chaffin's individual note, without security, remarking he would trust Chaffin, or words to that effect. At the time of this last transaction, he is not aware that prudent men did lend money to Chaffin without good security; he certainly would not have done so. He did, while he considered Chaffin solvent, stand security for him for large amounts, and had subsequently to pay large amounts for him. At the time he gave notice to Dr. Royston, he considered Chaffin very doubtful indeed, and at that time Chaffin had not notified his securities of his true condition, nor had he turned over any portion of his' effects, or property, for their protection, so far as he knows or believes.

The complainants then read the depositions of *James Peake*, who swore, that he did not borrow money of George D. Royston, but that said Royston bought notes on him, and waited with him from one to three years to pay them. Dr. Royston said it was money belonging to the heirs; he said he had purchased negroes, some mules and wagon, with his own money, which had about exhausted his funds, or a little more. The notes traded for on witness amounted to something near two thousand dollars; he can't say whether it was over that or under it, at $12\frac{1}{2}$ per cent. G. D. Royston told him he was loaning money belonging to the heirs, part of which he loaned at $12\frac{1}{2}$ per cent.; as to how much and how long, does not know.

Complainants then introduced *Benj. O. Keaton*, who swore, that he knows the land; worth $3 per acre rent from 1840 to the death of Dr. Royston in 1852, annually; never heard of any public renting by Dr. Royston; Dr. Royston went into possession soon after his intermarriage with Mrs. Calaway; don't remember when that was. There were from 300 to 400 acres cleared land when Dr. Royston took possession. The fence appeared in bad condition; Dr. Royston repaired fences, and put a good log cabin on it—four or five rooms to

it; had a gin-house and screw; does not know what the house was worth; the land was worth two dollars per acre rent from 1840 to 1852, after deducting repairs.

*Hamlin J. Cook* was then introduced, who swore, that he borrowed money of Dr. Royston once at 8 per cent.; Royston said his rate of interest was 15 per cent. Said he had the money of Calaway's children to loan; refused to shave paper at less than 16 per cent. On cross-examination, said that he sold brick to Royston for the house he built on the lands. Dwelling, out-houses and gin-house were all worth $1,200 or $1,500. Dwelling house double pen, one and a half stories high log house. Royston cleared eighty acres; worth to clear it three to four dollars per acre. The defendant's counsel asked witness how much the improvements put on the land by Dr. Royston added to its value, to which counsel for the complainants objected, and the Court overruled the objection, and complainant excepted, and witness swore that the improvements added to the value of the land considerably, but how much he could not say; and that the Peggy Howard lands lay out in the year 1841 without rent; a portion of the Porter lands lay out part of the time between 1841 and 1850, and against the exceptions of counsel for complainants, witness was allowed to state it, it was almost the universal rule that every four or five years renting plantations were rented for repairs of the dilapidated portions of the plantation, and that the Henderson place, adjoining the Calaway lands, rented one year for fifty cents per acre, and to which the complainants excepted. The lands were worth two dollars per acre rent per annum, besides improvements. The house was built in 1842; was occupied by no one but Dr. Royston till his death. The Calaway lands are the very choice lands in the whole country.

*U. M. Robert* was then sworn, who said he rented land adjoining the Calaway plantation in 1849, and thinks the Royston place was worth two dollars for that year, and every year since; offered to rent the place one year, and Royston

told him he wanted it himself; rented adjoining place from Clarke of Starksville, at $1 or $2 per acre, and place in a dilapidated condition. Peggy Howard's land rented by him was worn out, and the Royston lands as good as any in the country.

*Wm. H. Robert*, sworn by complainant, testified, that he attended to his father's (U. M. Robert) business on the Peggy Howard place, adjoining the Calaway or Royston place. He saw one advertisement stuck on a tree at the post-office at Dr. Royston's house, for the rent of the lands, and went there that day, and the place was rented out before breakfast; that he ate breakfast early and went immediately there, and was told when he got there, by Royston and his overseer, that the land was rented, and that Royston rented it. There was no one there but Royston and the overseer; that his father would have done better to have paid three dollars per acre for the Royston land than to have cultivated the Peggy Howard place free of rent. And complainants here closed their case.

### Evidence for Defendants.

*Wm. Newsom* swore, that Dr. Royston moved on the land in 1841, the first of the year; cleared 75 acres and planted it in 1841—clearing on the east side of the creek; cleared 20 acres connected with the Proctor field, also on the east side of the creek. Cleared land on the west side of the creek, 300 or 400 acres before Newsom went there. The annual rent of the lands worth two dollars per acre, and the improvements kept up; thinks there is now open on the place five hundred acres. The twenty acres cleared in the Proctor field was fenced, and clearing not worth so much—gin-house, dwelling and other improvements worth $500 or $600. Knows the Jones or Howard place; knows that in 1852 that the lands were rented after breakfast—11 or 12 o'clock. He bid one bid himself, and Royston took it at the next bid. There was comparatively no competition in the bidding. Borrow e

money from Royston at lawful interest; told witness that he did not lend at lawful interest to every one.

*Jonathan Davis* was next sworn by defendant, who testified, he knows the lands. The first year Royston worked the lands lands rented high, but for several years thereafter lands rented from twenty-five to fifty cents per acre; Howard lands rented one year for $1 per acre, as valuable if not more so, than the Calaway lands. Witness rented one year the Island place, equal, or nearly so, to the Calaway place, at fifty cents per acre. To this testimony counsel for complainants objected, and the objection was overruled, and the complainants excepted. The Porter place, comparing favorably with the Calaway place, rented from fifty cents to $1 per acre. From 1841 to 1854 a fair average price of the rent, with improvements, from $1 to $1 50 per acre. When Royston went there, could not have been more than two hundred and twenty-five to two hundred and fifty acres cleared—seventy acres cleared in one field and forty in another by Dr. Royston; worth to clear it, five to six dollars per acre. House put up by Royston is a double log house one and a half story, sheded in the rear and piazza in front—altogether worth $800 or $1,000. If the place had been rented at public outcry from 1841 to 1854, for three or four years, it would have brought its full value without reference to fences, but after that don't think it would have rented at all. Dr. Royston left it in good repair. The Hents place went into dilapidation. He was present one year when the Calaway lands were rented; Dr. Royston rented it himself—this was between 1841 and 1844. Don't remember whether David H. Janes was there. Has seen an advertisement for the rent of the land; don't remember what it brought. Knows nothing about the renting of the Calaway place but one year. The Island place was. rented by witness one year, from 1841 to 1843. At the Howard renting, some thirty people were present. In 1841, 1842, 1843 and 1844, cotton ranged from three and a half to six cents. Complainants by their solici-

tors, objected to all the testimony of all the witnesses in relation to what other lands rented at—the objection being overruled and the evidence allowed, complainants excepted, and now assign the same as error.

*Roger Q. Dickinson* being sworn, the defendants proposed to prove the standing of Thomas Chaffin in 1840 and 1841, to which complainants objected, and the objection was overruled, and counsel for complainants excepted, and witness then testified that he knew Chaffin in 1840 and 1841, and that he was considered very good until about 1841; that W. Peake was his partner, and knew his circumstances better than any one else, and Dr. Royston knew that Chaffin and Peake had been partners, and that Peake had a good opportunity to know his pecuniary condition. Chaffin broke suddenly; Peake and others took his small notes in the early part of February, 1841. Chaffin's credit was good. Exhibited note of Chaffin's identical hand writing. A short time before 1st March, 1841, ninety-nine one hundreths of the people of Chaffin's acquaintance would have credited him readily. Chaffin and Peake had been in partnership before 1841, and Dr. Royston knew it. Witness and William Peake were on Chaffin's paper for a large amount. He would have thought it very imprudent to have given up Chaffin's note, with William Peake as security, and taken Chaffin's none without security in January, 1841.

The defendant then read in evidence Mrs. Calaway's election of a child's part in lieu of a dower out of the lands of F. G. Calaway.

The defendant offered to read the returns made by defendant, as administratrix with the will annexed on the estate of G. D. Royston, as annexed to answer as an exhibit—to which complainant objected: 1st. Because the Court of Ordinary of Lee county, to whom the returns were made, had no jurisdiction; and 2d. Because defendant could not make return of expenditures as guardian of the ward of testator: which objection was sustained, and counsel for defendant

moved for continuance, and the Court having decided that the defendant was entitled to a continuance, counsel then withdrew the objection, and the returns were read as evidence. The note of Chaffin was then read, dated 1st January, 1841, due one day after date, for nine hundred dollars, and a receipt of C. A. Royston on 8th November, 1852, for three hundred and forty dollars, and another receipt of complainant for $343 82, dated 7th March, 1853; one receipt dated November 10th, 1852, for $3,800; one receipt dated 1st January, 1853, for $3,000; one receipt dated 2d March, 1853, for $800; and one other receipt dated 25th May, 1854, for $2,625 09.

Defendant then offered to read the depositions brought into Court by complainant, of *James H. Ragan* and *Edward Janes*, and proposed to read that part of the depositions which gave the sayings of Geo. D. Royston, to which complainants objected, and the objection was overruled, and complainants excepted. They swore that George D. Royston said he would lose $1,000, money he had loaned Chaffin; that the rent of the lands were worth from one to two dollars per acre from the time Royston had them.

Defendant introduced the testimony of *Thomas Chaffin*, (and complainants objected on account of interest, and the Court overruled the objection, and the complainants excepted,) who swore, that he had many pecuniary transactions with G. D. Royston, the last of which, fourteen years ago, and he gave Royston his notes; does not remember whether it was on his individual account the money was loaned or his ward's; note not yet paid; that his circumstances were prosperous when he borrowed that time; did borrow of prudent men without security. William Peake, Royston, and others, were on his note, or notes, as security, and he turned over to Dickinson, Peake and Dewberry's assets of fifty thousand dollars, to save them, as he thought, amply sufficient to protect his sureties. Dr. Royston loaned him the money in good

faith; that he had good reason to believe he was solvent; that witness failed suddenly.

*Jonathan Davis*, recalled.—Thinks about two hundred and fifty acres cleared land when Royston got possession. Royston loaned Oglesby money at eight per cent, and Dr. Royston said he did not loan his ward's money at over eight per cent, or lawful interest. To the sayings of Royston, counsel for complainants objected, and the objection was overruled by the Court, and complainant excepted. He was very well acquainted with Thomas Chaffin in 1841; was good until the first of the year 1841; that his failure was sudden and expected to his friends. On *cross examination*, said Royston loaned Oglesby $1,200 or $1,500, and it was sometime between 1840 and 1845; Chaffin was a man of large business, and a speculator. Peake and Dr. Dickinson stood his security. He bought and sold land. In the beginning of 1841, witness stood Chaffin's security on amount; that he knew of the loans to Oglesby by hearsay alone. All this ruled out by the Court.

*David A. Vason* was then sworn, who stated that Dr. Royston held a note, principal and interest, for about $10,000 at the time stated, on Oglesby; Pope's note about the same amount, probably less; one payment on Pope's note made a short time after his death. Pope died June, 1846; settled at eight per cent. Rents from 1841 till 1844 very low; Schley's place, William's place, Porter's place, Hents' place, and a large number of places vacant; that the lying out of these lands affected considerably their value. To this evidence objections were made by complainant and overruled by the Court, and excepted to by complainant. That this plantation could have sold within two years for twenty dollars per acre; thinks it worth that now. The defendant asked witness thus: "Mr. Vason, do you know what efforts Mrs. Royston made to collect money to pay complainants?" To which the counsel for complainant excepted, and the Court overruled the objection, and counsel for complainant excepted, and witness

then testified, that soon after Mrs. Royston took charge of the estate, she instituted suits to a large amount to get money to pay off Dr. Royston's wards, and it was worth two and a half or three per cent. on the amount. Paid Oglesby's note; 6 or $8,000. There was at the time Dr. Royston took possession of the land, two hundred and twenty acres on west side of the creek, and Proctor field on east side of forty acres. On *cross examination*, Royston cleared seventy or eighty acres; cleared in another field forty acres. To clear the lands was worth eight or ten dollars per acre. Did not come here till 1840. Paid off part of Ogleby's note in money and part in other notes payable to Mrs. Royston, as executrix, and was given for rent of land and purchase made at sale of Royston's property, one thousand and one hundred dollars paid in a note on Joseph Bond.

*W. J. Lawton* sworn for defendant, and says: That the assets of G. D. Royston, consisting in lands, negroes, mules and notes; some notes payable to Royston as guardian, but most of them to Royston individually. Mrs. Royston proceeded to collect notes, and gave five per cent. for the first $1,000, and two and a half per cent. for all after; cannot say what amount was payable to Royston as guardian. He, as agent for defendant, rented the land once to Oglesby at $900 one year, (1853;) worth as much in 1850, 1851, 1852 as in 1855. Over twenty thousand dollars of notes of hand at his death, and all have been collected.

The complainants in rebuttal, introduced *William H. Robert*, who swore: That he heard George D. Royston say that he had $10,000 of his ward's money out at interest, and loaned it out at twelve and a half per cent. The evidence being closed, counsel moved to detach from the answer a statement and calculation made by defendant's counsel. The Court ruled it was not evidence, and admitted it as pleading.

Royston et ux. vs. Royston, adm'x.

The evidence and argument of counsel having closed, complainant's solicitors requested the Court to charge the jury, 'that by the Act of 1792, executors and administrators are required to make annual returns of the state and condition of their estates by the first day of January, or within ten days thereafter, and that by Act of 1810, it was extended to guardians, and that the Act of 1792, was of force as regards the time within which the returns are to be made until the Act of 1850, which extends it to 1st July, and that unless full and correct returns are made and rendered in manner pointed out by law in each and every year, the executor, administrator, or guardian shall prefix his commissions," and which the Court refused to do, but gave the request with the qualification that the executor or administrator would be entitled to commissions for the year for which returns were made.

2d. That if the Jury believe there was a fraud practiced by Dr. Royston in renting the ward's lands, they are authorized to go behind the returns, and find the real value of the rents of the land, and that in ascertaining whether there was a fraud in relation to the rents, they are authorized to look to the amount of rent in 1839, and to the amount of rent in 1840, and if the jury believe that Dr. Royston rented out the land in 1839, and that Royston moved to and occupied it in 1840, and the rent was $299 or $399, in 1839, and $24 in 1840, and the renting was private and in secret, and at any time rented before breakfast, these facts found to exist, the jury may infer fraud.    This was given as the law.

3d. That if the complainants in this bill were attempting to recover the value of the land in this suit, then the defendant would be entitled in equity to set off the value of the improvement put upon the premises by Dr. Royston; but if the jury believe from the evidence the building of the dwelling house, gin house and cotton screw, &c., were put on the farm by Dr. Royston in 1852, for his own use and convenience, and that he occupied the premises until they become

dilapidated, then these improvements or value thereof ought not to be allowed the defendant, and the Court refused so to charge, and complainant excepted.

4th. That to entitle a guardian to commissions, he must make his annual returns as pointed out by law, and he is not entitled to any commissions upon any funds of which he has made no returns;* and hence no matter what amount of interest Dr. Royston, as guardian, may have made, yet if he has made no returns of interest he cannot be allowed any commissions on interest accumulated in his hands; and which he refused to charge, to which complainant excepted.

That if the jury believe from the evidence that there is any fraud exhibited, either in Royston's returns or the parol evidence, as to the renting of the land, or of making no returns of the accumulating interest in his hands, then the mode of computing the interest is to calculate the interest at eight per cent. per annum, for six years, upon the amounts coming into the guardians hands, and at the end of every six years to compound it up to the 1st January, 1848; and from the 1st January, 1848, calculate the interest at seven per cent. for six years, and after six years compound annually at six per cent., and that this latter method obtains whether there has been any fraud or not since 1848; and which charge he refused to give entire, and to which refusal complainants excepted. The Court gave this request except the sentence "or in making no returns of the accumulating interest in his hands."

That if the jury believe from the evidence that Dr. Royston, in 1840, rented to Wm. Peake forty or fifty acres of the land at $4 per acre, and returned rent for that year, only $24 65, this is strong evidence of fraud, and the jury will make him open all the returns of rent and find the real value as proven by the evidence; and if the jury so find, compound

---

* The Court gave in charge the first part of this request, but refused the deduction.

interest is to be computed against defendant, as specified in the seventh request, and which the Court refused to charge, and to which refusal to charge in the several requests, and to the charges made, the counsel for complainant excepted, and now assigns the same as error.

And the counsel for defendant requested the Court in writing, to charge the jury, 1st, that defendant is entitled to two and a half per cent. on all sums received by G. D. Royston, as guardian, and two and a half per cent. on all sums paid out by him, as guardian, in those years that he made returns; and, 2d, that he is entitled to ten per cent. commissions on all the gross accumulations of interest on the fund in his hands during his guardianship ; and which the Court charged, and the counsel for complainant excepted to the charge, and now assigns the same as error.

The complainants asked, as the fifth ground, the Court to charge, that in making a settlement with a guardian for trust funds in his hands, simple interest at eight per cent. per annum on the principal to 1st Jan., 1846, and at seven per cent. per annum from that time *is the rule,* and that rests are the exception to that rule, and a rest is never allowable unless a special case is made of gross neglect, fraud, or some such circumstance is shown ; and in the sixth ground, that in making their calculation they must keep the principal sum, and cannot separate and pay the expenses out of the interest, when a sufficiency had accumulated in the hands of the guardian for that purpose ; to which charge the counsel for complainant excepted, and now assigns as error. And the seventh ground of request of defendant was, that if they are satisfied from the evidence that the funds of this complainant in the hands of Royston at his death were in notes, and she had to pay lawyers commissions to reduce the same to money to meet this demand, then defendant is entitled to a deduction of so much of said fees as has been proved. And

in the eighth ground, that in making their calculations from
the first, the guardian is entitled to retain enough of the fund
in his hands, without paying interest on the same, to cover
the disbursements for the following year; to which charge
the counsel for complainant excepted, and now assigns the
same as error. In the ninth and tenth ground, the counsel
for defendant requested the Court to charge the jury, that if
they are satisfied from the evidence that the land was fairly
rented, and brought all that it would, then complainant can-
not disturb the rent returns as made; but if they are not sat-
isfied the renting was properly done, or brought what the
land was worth for rent, or what it would have done if oth-
erwise rented, then they can open the returns and go for the
value of the rents; but in doing this they may take into con-
sideration the improvements put by Royston on the planta-
tion, the clearing the land, building of houses, and keeping
the plantation in proper state of cultivation, and if these im-
provements were worth more (taking into consideration the
increased value of the land, these when added to the rents
charged,) than the actual value of the rent for the whole time,
then the complainant will not be entitled to recover anything
on account of the low amount of the rents returned; and
which the Court charged, and to which charge the counsel
for complainants excepted, and now assigns the same as error.

In the eleventh and last ground, the counsel for defendant
requested the Court to charge the jury, that under the stat-
ute of 1810, it is not necessary that the guardian shall make
his return within ten days from 1st January in each year. It
is sufficient that the returns are made annually; that it is not
necessary for a guardian, in his annual returns, to include
the amount of the accruing interest; it is only necessary to
charge himself with the principal sum received, and report
all the disbursements made for the year previous; and which
was given in charge by the Court, and to which counsel for
complainants excepted, and now assigns the same as error.
And also assigns the several rulings and charges and refusal

Royston et ux. vs. Royston, adm'x.

to charge as requested by complainants, as error, and prays that this bill of exceptions may be certified, &c.

WARREN & WARREN; and SCARBOROUGH, for plaintiffs in error.

STROZIER; SLAUGHTER; LYON & IRWIN; VASON & DAVIS, *contra.*

*By the Court.*—STEPHENS J. delivering the opinion

This is a bill by Cyrus A. Royston and wife, against the administratrix of George D. Royston, who was guardian of the wife, for an account of his ward's estate. Each party brings a writ of error, but by combining the two cases, each side assigns error in this case, wherein the complainants below are plaintiffs in error.

[1.] The first assignment of error by the complainants, is the refusal of the Court to strike out, as impertinent, a portion of defendant's answer, instituting an invidious comparison between this complainant and one Swain, who stood in the same position, but who is represented as having acted a much more generous part. It was conceded in the argument that this portion of the answer was not pertinent, and was calculated to injure complainant's case, but it was insisted that the motion to strike it, coming after replication, was too late. Such seems to be the rule under the English system of equity, but the reason for the rule under that system does not apply under ours. There to have an answer purged of impertinence or scandal, it must be referred to a master. This involves delay, and hence will not be allowed generally, after the case is ready for a hearing. But here it is done by the Judge, on motion, at any time before the case is submitted to the jury, and one time for it involves no more delay than another. *Cessante ratione legis, cessat lex.* We think the Court erred in refusing to purge the answer.

Royston et ux. vs. Royston, adm'x.

[2.] The next assignment of error by the complainants, is the refusal of the Court to strike from the answer a calculation which formed a part of it. The calculation is not before us, it having been voluntarily withdrawn by the complainants, as we learn from the argument, and we cannot, therefore, form a very satisfactory opinion as to whether it was obnoxious to objection or not. But we think its withdrawal cured whatever objection there might have been to it. It is said that counsel were allowed to argue upon it after it had been withdrawn. Argumentativeness may be a good objection against an answer, but it will scarcely serve against a *speech*. We think there is no error apparent in this assignment.

[3.] The contested items in the account were mainly rent and interest, and the next assignment of error is the allowance by the Court of evidence to show, by way of reducing rent, how much value was added to the ward's land by improvements put on it by the guardian, while it was in his hands. We think there was no error here. It was proper that the guardian should be credited with the value of the improvements made by him, but at the same time he should have been charged with the rent as increased by that superadded value to the land.

[4.] We think the next assignment of error is bad. It was proper to admit evidence showing that neighboring plantations lay idle during some years while the guardian had possession of this plantation, for this was a circumstance legitimately tending to lessen the rent, by showing the dull demand for lands. Nor was there any error in admitting evidence that it was very common for renting plantations to be rented once in every four or five years, for no price but repairs, nor in admitting evidence of what rent other similar lands, in the same neighborhood, brought during the same years. The thing to be proven was the market value of the rent—a matter of judgment, and he who has reasons for his judgment is, at least, as good a witness as he who has none.

All these things are only reasons for the judgment of a witness.

[5.] The next assignment of error is by the defendant. She, as administratrix of the guardian, offered to put in evidence returns made *by her* of moneys paid out by her after the death of the guardian, and also of moneys paid out by the guardian in his life-time, but not returned by him to the Court of Ordinary. We think this evidence was properly rejected by the Court. There is no law authorizing the administrator of a deceased guardian to make returns for him. These items ought to have been proven in the same manner as all other unreturned items.

[6.] The defendant was allowed, against the objection of complainants, to give in evidence the sayings of the guardian to show at what rate of interest he had lent his ward's money, and also to show that in relation to a certain sum which he had lent to Chaffin, and for which the ward was seeking to hold him liable on account of his negligence, he had used the same care and diligence that he had used with his own money. A fatal objection to the evidence is, that it was his sayings in his own favor, offered by himself. It was improperly admitted.

[7.] The defendant was allowed, against the objection of complainant, to give evidence of her having to resort to law in order to collect the money which had been lent out for the ward by the guardian, and of reasonable attorney's fees for these collections. We think this was proper evidence, taking strict care to confine it to collections of moneys which were certainly the ward's.

[8.] The evidence being closed, the complainants asked the Court to charge the jury, that if the guardian had failed to make return of his acts by the 10th day of January, for any year prior to 1850, he had forfeited his commissions on the whole estate. The Court refused so to charge, but charged instead that he was entitled to commissions on all returns which had been made in time. We think the charge

asked was properly refused, and that the charge, as given, was less than the defendant was entitled to have had. The Act of 1792, (*Cobb Dig.* 306,) is the only one providing for a forfeiture of commissions on account of a failure to make returns; and, singularly enough, it does not embrace *guardians* in that provision. Guardians, therefore, are left to stand on the Act of 1764, (*Cobb Dig.* 304,) prescribing commissions without regard to the making or omission to make returns.

[9.] On the charge in relation to interest both sides assign error, and without repeating what the charge was, I will state what we conceive the true rule of interest to be. Up to the 1st of January, 1848, when the Legislature prescribed a rule from that time forth, we think simple interest the rule, and compound interest the exception—simple interest unless there be fraud or gross negligence on the part of the guardian, and in case of such fraud or gross negligence, then compound interest, the compounding to be done at the end of each six years. And the *rate* of interest, whether simple or compound, is eight per cent. per annum up to the 1st January, 1846, and after that, seven per cent. per annum up to the 1st of January, 1848. After 1st January, 1848, the Legislature has prescribed a rule of its own. For trustees, who were such at the passage of the Act, (as this one was,) that rule is seven per cent. per annum for the first six years from and after the 1st January, 1848, without compounding, and afterwards six per cent. per annum, compounded annually.

[10.] We think the Court properly refused to charge the jury, as he was asked in substance to do, that the guardian's failure to make returns of the accumulating interest in his hands was a circumstance by itself, authorizing them to find fraud and charge compound interest. It is very seldom that trustees do make returns of such interest accumulating in their hands. It is very proper they should do so, but their failure is not sufficient of itself to authorize the conclusion of fraud. To so hold, would be to taint nine-tenths of all the returns in the country with fraud, at a single blast. We

think, also, that the Court was right in refusing to charge the jury, that the fact of the guardian's having, in 1840, rented out a part of the land for $160 or $200, returning only $24 65 rent for that year, was strong evidence of fraud. The jury ought not to have been instructed that that single fact was "strong evidence of fraud," for it was open to explanation from other circumstances, as for instance the improvements which he had put on the place that year, and the jury ought, therefore, to have been left to consider that fact in connection with all the rest, in making up their judgment as to fraud or no fraud, and so compound or simple interest.

[11.] We think the disbursements of the guardian ought to have been made out of interest, and not out of the principal. There is some difficulty in understanding what the charge was on this point, and we simply pass it with stating what it ought to have been.

[12.] We think the Court committed no error in charging the jury, that the guardian was entitled each year to retain in his hands, without interest, from the beginning of the year, enough of the funds to cover his disbursements for that year. It would be unreasonable to charge him with interest on a fund which he must hold and not use, in order to meet, as is his duty to do, the current expenses of the year.

[13.] Another point in the record is, in relation to the guardian's commissions upon *interest*. The conclusion to which this Court came on this subject is as follows: It is not a matter of course that the guardian is to have ten per cent. commission on all interest. The lowest limit is two and one-half per cent., for by the statute he is entitled to two and one-half per cent. on all sums " paid away in debts, legacies, or otherwise," and as the interest must be paid away by him in his settlement with his ward, he is entitled to two and one-half per cent. on that, as on principal. On the other hand, ten per cent. is the highest limit to which he may reach or not, according to the opinion which the jury may entertain of the skill and fidelity with which he has managed the estate.

The provision in relation to ten per cent. on interest, does not *confer* that amount of commission, but is only a *proviso* that the commission shall not *exceed* ten per cent. on the interest. When the guardian simply allows the money of his ward to remain in his own hands without lending out, and thus renders himself chargeable with interest, this is a case for two and one-half per cent. only ; but when he lends out the money to other people he is entitled to five per cent. commissions on interest, for in this case he *receives* interest and (on final settlement) pays it away, and on each operation he is entitled to two and one-half per cent., or which is the same thing, five per cent. on the two together. Such is the conclusion to which this Court came, upon the subject of commissions on interest; but while I avow, as the truth requires I should do, my full share of the responsibility of that conclusion, candor demands that I should say that subsequent examination and reflection have satisfied me that the conclusion is an erroneous construction of the Act of 1764. It is needless to state here what I now deem to be the true construction, for stated under these circumstances it would be a mere *dictum*, I might want to take it back at some other time. This branch of the case was was not discussed at all in the argument, and the decision, therefore, is scarcely to be regarded as a well considered one. I make this remark simply by way of protesting against its being drawn into an authoritative precedent. A decision pronounced upon full argument and consideration, is justly entitled to great weight ; indeed, to a controlling influence on subsequent decisions; but such decisions as this Court, from the nature of its organization, is sometimes obliged to render, without argument, and on short consideration, ought, in my judgment, to carry but slight *authority* for subsequent decisions.

Judgment reversed.